## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

**JULIET E. SHIPLEY,**

      **Plaintiff,**

**v.**

**SPEIRO ACADEMY, INC.;**
**A West Virginia Corporation;**
**SPEIRO ACADEMY SCHOOL**
**OF MINISTRY & FINE ARTS;**
**An Ohio Corporation;**
**NEW HEART COVENANT**
**CHRISTIAN CENTER, INC.;**
**SUSAN OLINDA CLINE; and**
**BARRY SCOTT CLINE, SR.; and**
**DOES 1-10;**

      **Defendants.**

**Civil Action No.:** _____

**Judge** _____

---

## COMPLAINT

---

### PARTIES

1.    <u>Plaintiff Juliet E. Shipley</u> is a resident and citizen of Ohio County, West Virginia. Ms. Shipley's date of birth is XX.XX.2005[1], and she was 18 or under the age of 18 when the events complained of herein occurred.

2.    <u>Defendant Speiro Academy, Inc</u>. was, at times relevant to events herein, an entity incorporated in the State of West Virginia with a principal office address of 135 Stewart's Hill Road, Wheeling, WV 26003. Upon information and belief, at times relevant to this litigation, Speiro Academy Inc., together with or separate from other Defendants herein, operated an

---

[1] Plaintiff's full date of birth will be provided to counsel under separate cover.

elementary, middle and high school known as "Speiro Academy School of Ministry & Fine Arts" in Belmont County, Ohio with an address of 500 N. 5th Street, Martins Ferry, OH 43935-1602.

3.    <u>Defendant Speiro Academy School of Ministry & Fine Arts, Inc.</u>, is and has been since August 16, 2017 a nonprofit entity incorporated in Ohio with a principal office address of 500 N. 5th Street, Martins Ferry, OH 43935-1602. Upon information and belief, at times relevant to this litigation, Speiro Academy School of Ministry & Fine Arts, Inc., together with or separate from other Defendants herein, operated an elementary, middle and high school known as "Speiro Academy School of Ministry & Fine Arts" in Belmont County, Ohio at the address 500 N. 5th Street, Martins Ferry, OH 43935-1602. Hereafter, reference to "the School" shall mean this entity and the school on these premises as operated by Speiro Academy School of Ministry & Fine Arts, Inc., its officers, directors, and agents or other Defendants herein.

4.    <u>Defendant New Heart Covenant Christian Center, Inc.</u> is a nonprofit entity incorporated in 2008 in the State of West Virginia with a principal office address of 148 Cast Valley Ln., Wheeling, West Virginia, 26003. It operates a church in the same building as the School at 500 N.5th Street, Martins Ferry, OH 43935-1602, and did so at times relevant to this litigation. Hereafter, reference to "the Church" shall mean this entity and the church on these premises as operated by Defendant New Heart Covenant Christian Center, Inc., its officers, directors, and agents or other Defendants herein.

5.    <u>Defendant Susan Olinda Cline ("Susan Cline")</u> is a resident and citizen of Wheeling, West Virginia and was an adult over the age of 25 years at times relevant to this litigation.  Susan Cline was the incorporator and president of Speiro Academy, Inc. at times relevant to this litigation. Susan Cline was also the incorporator of Speiro Academy School of Ministry & Fine Arts, Inc., and upon information and belief, served as an officer thereof at times relevant to this litigation.

2

6.     Defendant Susan Cline controlled daily operations of the School and was also a pastor serving at the will and pleasure of the Church at times relevant herein. References to "Susan Cline" herein designate her in her individual capacity as well as in the scope of her duties and capacities on behalf of other Defendants herein, in which she was acting at all relevant times.

7.     Defendant Barry Scott Cline, Sr. ("Barry Cline") is a resident and citizen of Wheeling, West Virginia and was an adult over the age of 25 years at times relevant to this litigation.  Barry Cline is and was at times relevant to this litigation the incorporator and president of Defendant New Heart Covenant Christian Center, Inc.

8.     Defendant Barry Cline served at the will and pleasure of the Church and/or School and was also a pastor serving at the will and pleasure of the Church at times relevant herein. References to "Barry Cline" herein designate him in his individual capacity as well in the scope of his duties and capacities on behalf of other Defendants herein, in which he was acting at all relevant times.

9.     DOES 1-10 are individual officers, Board members or directors, owners, staff, agents or entities of one or more Defendant(s) who may share responsibility for the acts and allegations herein. The identities of DOES 1-10 are known to Defendant(s) but currently unascertainable by Plaintiff without discovery. When the identities of such persons or entities are known, Plaintiff will amend her Complaint with proper nomenclature.

## JURISDICTION AND VENUE

10.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff brings this action under 18 U.S.C. § 2255, as well as 18 U.S.C. §§ 1589, 1590, 1591, 1595, 2422, 2242, and 2243.

11.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because all other claims advanced herein are related to the claims with original jurisdiction and form part of the same case or controversy.

12.     Plaintiff's claims arise out of the same series of transactions or occurrences and share common questions of law or fact. The essential facts of Plaintiff's claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in a single lawsuit.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to the claims asserted in this action, including some of Defendants' misconduct and abuse upon Plaintiff, occurred in this judicial district.

## JOINT ENTERPRISE/JOINT VENTURE AND ALTER EGO

14.     The term "Defendants" throughout this Complaint shall mean any one or more of the named Defendants and any one or more of the DOE Defendants 1-10.

15.     Whenever reference is made in this Complaint to any act, deed or conduct of Defendants Speiro Academy, Inc.; Speiro Academy School of Ministry & Fine Arts, Inc; New Heart Covenant Christian Center, Inc.; or DOES 1-10, the allegation is that these Defendant(s) engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of the Defendant(s).

16.     Defendants Speiro Academy, Inc., Speiro Academy School of Ministry & Fine Arts, Inc., Defendant New Heart Covenant Christian Center, Inc., (the "Entity Defendants"; also included in all allegations against "Defendants"), Susan Cline and Barry Cline and DOES 1-10 are alter egos of one another and operate as a single employer, business, and enterprise or venture.

17.     The Entity Defendants are commonly owned and operated by Susan Cline and/or Barry Cline; and among them have common officers and management; share common purposes of operation; use common equipment and facilities; and may have paid debts for one another or shared profits as may be uncovered in discovery.

18.     Defendants operate in joint enterprise or joint venture to carry out a single business enterprise for profit, combining their property, money, effects, skill and knowledge in a common undertaking and/or conspiracy.  Upon information and belief, Defendants' relationship arises out of a contractual relationship, whether oral or written, express or implied, whereby profits are shared and there is joint management and control of the business enterprise/venture.

19.     There is such unity of interest and ownership among Defendants that the separate personalities of entities and individuals do not exist; and fraud, injustice, or other inequitable results will occur if they are not recognized as alter egos, joint venturers or a common enterprise.

20.     For example, at relevant times, Entity Defendants' governing boards had common members, and the Church board determined scholarships for students attending the School. The Church was an avenue for recruiting students to the School and promoted the School.

21.      The Church promoted and hosted events for the School, and vice versa, and the Church operated out of the same building as the School. With rare exception, every child enrolled at the School also attended the Church. Defendants incorporated Church doctrine into the education and various activities of the School.

22.     Upon information and belief, the School and the Church shared accounts and/or exchanged money and/or resources and staff.

23.     Additional details establishing the joint enterprise/alter ego relationships are currently unknown to Plaintiff, but may be developed through discovery as needed.

24.    For all of these reasons, disregard of the corporate formalities and fairness requirements make piercing the corporate veil among Defendants appropriate.

25.    In the alternative, if direct or joint enterprise/joint venture or alter ego liability is not found, Defendants are liable under vicarious liability, *respondeat superior*, and agency principles for all allegations set forth herein.

## <u>LEGAL STANDARDS FOR STATUTORY CLAIMS</u>

26.    Federal statutes provide numerous avenues for civil redress of personal injuries arising from sexual abuse and forced labor of minors. Among these are 18 U.S.C. § 2255, which provides, in relevant part:

   a.  *In general* - Any person, who, while a minor, was a victim of a violation of section 1589, 1590, 1591…2242, 2243, 2422…of this title and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue in any appropriate United States District Court and shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred. The court may also award punitive damages and such other preliminary and equitable relief as the court deems to be appropriate.

   b.  *Statute of Limitations* – There shall be no time limit for the filing of a complaint commencing an action under this section.

   c.  *Venue* – Any action brought under subsection (a) may be brought in the district court of the United States that meets applicable requirements relating to venue under section 1391 of title 28.

27.    The federal prohibition on forced labor, 18 U.S.C. § 1589, provides:

   a.  Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means –
      1.  By means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
      2.  By means of serious harm or threats of serious harm to that person or another person;
      3.  By means of abuse or threatened abuse of law or legal process; or

    4. By means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,
Shall be punished as provided under subsection (d).

    b. Whoever knowingly benefits, financially or by receiving anything of value, from participation in an venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

    ***

    c. (2) The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services to avoid incurring that harm.

28. The federal prohibition on forced labor, 18 U.S.C. § 1590, provides in relevant part:

    a. Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both.

29. The federal prohibition on sex trafficking of children, 18 U.S.C. § 1591, provides, in

relevant part:

    a. Whoever knowingly—

        1. In or affecting interstate or foreign commerce… recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means any person; or

        2. Benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

            knowing…that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

        3. The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

        4. The term "participation in a venture" means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1).

        5. ***

6. The term "venture" means any group of two or more individuals associated in fact, whether or not a legal entity.

30. Civil remedies for violations of §§ 1589 and 1591 are codified at 18 U.S.C. § 1595:

a. An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

31. Under the § 2255 umbrella above, any person who while a minor was a victim of sexual contact or coercion or enticement thereto in violation of 18 U.S.C. § 2422(a) or § 2423 may recover for personal injuries.

32. 18 U.S.C. § 2422(a) makes it illegal for anyone to "knowingly persuade[], induce[], entice[], or coerce[] any individual to travel in interstate…commerce…to engage in…any sexual activity for which any person can be charged with a criminal offense, or attempt[] to do so.

33. 18 U.S.C. § 2423(a) criminalizes "knowingly transport[ing] an individual who has not attained the age of 18 years in interstate…commerce…with intent that the individual engage in…any sexual activity for which any person can be charged with a criminal offense."

34. Separately, under § 2255, persons who while minors were subject to violations of 18 U.S.C. § 2244 may recover for personal injuries arising from "sexual contact" which would otherwise be criminalized as "sexual abuse" under 18 U.S.C. §§ 2242 or 2243(a)[2]. "Sexual contact" is defined

---

[2] 18 U.S.C. § 2242 criminalizes sexual abuse and provides that "whoever…knowingly
(1) causes another person to engage in a sexual act by threatening or placing that person in fear… or
(2) engages in a sexual act with another person if that other person is
     (A) in capable of appraising the nature of the conduct; or
***
(3) engages in a sexual act with another person without that other person's consent, to include doing so through coercion;
or attempts to do so, shall be fined…and imprisoned for any term of years or for life.

8

as "the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person. 18 U.S.C. § 2246.

35.　　Ohio Revised Code § 2305.111 defines "childhood sexual abuse" as any conduct that constitutes any of the violations identified in division (A)(1)(a) or (b) of this section and would constitute a criminal offense under the specified section or division of the Revised Code, if the victim of the violation is at the time of the violation a child under eighteen years of age [].

36.　　Victims of childhood sexual abuse have twelve years from the time the cause of action accrues in which to file suit for assault or battery based on childhood sexual abuse, or to file other claims relating to childhood sexual abuse. Ohio Revised Code § 2305.111(C).

37.　　Ohio Revised Code § 2305.111(A)(1)(b) includes within the definition of childhood sexual abuse any violation of Ohio Revised Code §§ 2907.05 or 2907.06, if, at the time of the violation,

  (i)　the actor is a person in loco parentis of the victim;
  (ii)　**
  (iii)　the actor is a teacher, administrator…or other person in authority employed by or serving at  a school for which the director of education and workforce prescribes minimum standards pursuant to division (D) of section 3301.07 of the Revised Code, the victim is enrolled in or attends that school, and the actor is not enrolled in and does not attend that school;
  (iv)　**
  (v)　The actor is the victim's athletic or other type of coach, is the victim's instructor, is the leader of a scouting troop of which the victim is a member or is a person with temporary or occasional disciplinary control over the victim.

38.　　Ohio Revised Code § 2907.05(A)(4), "Gross Sexual Imposition", provides in relevant part that no person shall have sexual contact with another or cause another to have sexual contact with

---

18 U.S.C. § 2243(a) provides that "whoever…knowingly engages in a sexual act with another person who (1) has attained the age of 12 years but has not attained the age of 16 years and (2) is at least for years younger than the person so engaging, or attempts to do so, shall be fined…imprisoned…or both.

the offender when the other person is less than thirteen years of age. (January 1, 2008 Version & March 22, 2019 Version).

39.    Ohio Revised Code § 2907.05(A), "Sexual Imposition", provides in relevant part that no person shall have sexual contact with another or cause another to have sexual contact with the offender when (1) the offender knows that the sexual contact is offensive to the other person, or is reckless in that regard; [ ] or (4) the other person is thirteen years of age or older but less than sixteen years of age, and the offender is at least eighteen years of age and four or more years older than such other person. (May 14, 2002 Version & March 22, 2019 Version)

40.    Ohio Revised Code § 2907.01(B) defines "sexual contact" as any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttocks, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

41.    Ohio Revised Code § 4165.02 states that a person[3] engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person does any of the following:

      a.    Represent[s] that services have characteristics or benefits that they do not have, in violation of § (A)(7); or

      b.    Represent[s] that goods or services are of a particular standard, quality or grade when they are of another, in violation of § (A)(9).

## FACTUAL ALLEGATIONS

42.    The preceding paragraphs are incorporated by reference as if set forth in their entirety herein.

43.    Defendants operated the School as a private pay institution for elementary, middle school and high school education in Belmont County, Ohio.

---

[3] Ohio Revised Code § 4165.01(D) defines "person" as an individual, corporation, partnership, two or more having a joint or common interest, or any other legal or commercial entity.

44.    In and around 2014 and continuing through 2020, Defendants held out the School out as a premiere private academy with advantages above those of public schools, and charged tuition for students' attendance.

45.    Among other communications during these times, Defendants represented on the School's websites and social media posts that they offered quality instruction by teachers with degrees.

46.    Defendants then also regularly represented that the School was approved for HOPE Scholarship West Virginia funds, which suggested that the State endorsed the quality of its programming, and which further targeted West Virginia students to cross state lines to attend upon the School's Ohio campus.

47.    Plaintiff Juliet Shipley attended the Church and the School from approximately 2014 to 2020, during which time she was in grades 5-12. Defendants knew that Plaintiff was under the age of 18 by virtue of her enrollment in their elementary, middle school and high school curricula. Defendants had full access to Plaintiff's date of birth on her student records.

48.    Defendants were in a special relationship *in loco parentis* to Juliet, a minor, while she was at their School, their Church, at the Clines' home, and on all related activities in which they were her custodian(s), and thereby owed her heightened duties of care and protection.

49.    Unfortunately, while Defendants promised that their School would confer education, nurture, and other benefits upon students, the School did little of that, and instead was a vehicle by which they as common enterprise proprietors could extract enrollment money while perpetrating various heinous acts and sexual contact upon students (including Plaintiff) as described more fully herein.

50.    These acts occurred at all three of Defendants' shared locations: the School in Ohio, the Church in the same building in Ohio, and the Clines' home in Wheeling, West Virginia.

11

51.     The acts complained of herein also occurred and upon other premises under the guise of Defendants' programming, i.e., dance competitions at out of state locations where Plaintiff and other students were in Defendants' care, custody, or control.

52.     Throughout the course of their conduct described herein, Defendants acted recklessly, wantonly, and with little or no regard for the rights of students, including Juliet Shipley, when it was certain or substantially certain that severe emotional distress and physical and mental injury would result from their misconduct as alleged herein.

53.     By operating the Church/School in Ohio, and soliciting West Virginia students (including Plaintiff) to attend there, Defendants persuaded, induced, enticed or coerced known minors across state lines to engage in illegal sexual activity/illegal sexual contact and illegal labor.

54.     Defendants, by and through Susan Cline and Barry Cline, transported Plaintiff, knowing she was under the age of 18, to and from the Church/School in Ohio to the home of Defendants Susan Cline and Barry Cline in West Virginia, and also to and from out of state performances related to the Church and/or the School, with intent that Plaintiff engage in illegal sexual activity and/or illegal sexual contact and illegal labor on multiple occasions described herein, as well as other occasions.

55.     By offering and requiring Plaintiff to attend such out of state programs/performances as part of their School- and Church-related curricula, Defendants further knowingly persuaded, induced, enticed or coerced a minor across state lines for those purposes.

56.     In these settings, after crossing state lines, Defendants intended to subject and did subject Plaintiff to illegal sexual activity/illegal sexual contact.

57.     Similarly, Defendants knowingly transported Plaintiff across state lines and/or knowingly persuaded, induced, enticed or coerced her across state lines for purposes of engaging in forced labor.

58.     Defendants gained profit, benefit, or other things of value from this illegal transport, sexual activity/sexual contact, and/or the illegal forced labor of Plaintiff.

### Childhood Sexual Abuse/Exploitation

59.     Defendant Susan Cline was the instigator of a sexually-charged environment at the School which was wholly inappropriate for any learning center, but especially one in which children of Juliet's age were present.

60.     This sexually charged environment persisted throughout the entire time Juliet Shipley attended the School.

61.     Defendant Susan Cline engaged in assorted grooming activities and directly perpetrated unwelcome sexual advances upon Juliet at the School, at School-sponsored or School-related events, at the Church or Church-related events, and at Susan and Barry Cline's home.

62.     For example, Defendant Susan Cline touched or slapped Juliet's buttocks on multiple occasions at the School, the Church, and at School- or Church-related events.

63.     On another occasion at the School, Defendant Susan Cline held Juliet's head against her breasts and spanked her buttocks.

64.     On two or more occasions at the School and the Clines' home, Defendant Susan Cline took Juliet's hand and made Juliet touch Susan's breasts, as Susan made noises indicating she was sexually aroused.

65.     On other occasions at the School, Defendant Susan Cline forced other girls to touch her this same way, once in Juliet's presence.

66. On one occasion at the School, Defendant Susan Cline grabbed Juliet's breast (over clothing) in front of her class and demanded that Juliet "unstuff [her] bra!"

67. In 2018, while on a trip for a School-related dance performance, Defendant Susan Cline attempted to persuade Juliet to allow her (Susan Cline) to insert a tampon inside the Plaintiff.

68. Defendant Susan Cline bought tampons and urged that Juliet, then approximately 15 or 16, allow her to "help" with the insertion of the tampon. Susan Cline was unnaturally persistent, despite Juliet's repeated rejections of her offer.

69. At the time of the incident, Defendant Susan Cline and Plaintiff were in a hotel room and other students were swimming. Plaintiff was embarrassed, afraid, and emotionally distressed at Susan Cline's insistence on tampon use and her insistence on "helping" with such a matter involving Plaintiff's intimate parts.

70. After much resistance from Juliet, Susan Cline relented.

71. As a result of participating in this dance performance and others on- and off-premises of the School and the Church, Defendants gained things of value including but not limited to increased publicity and notoriety for the School and/or the Church. Upon information and belief, participation in such competitions led to higher credentials and rankings and at times, prize money and/or trophies/medals which went to the School and/or the Church.

72. Trophies and medals won at these dance competitions were displayed at the Church and contributed to Defendants' recruiting and enrollment of additional students for a fee at the School, thereby yielding profit to the School and/or Defendants.

73. Defendant Susan Cline was a salesperson for Mary Kay products, and thereby received a commission which was contingent upon the amount of product she sold.

74.    Defendant Susan Cline increased her commissions and profit from Mary Kay sales by enlisting students from the School to promote the products at events she hosted.

75.    At these events, which she hosted at the School and at her home, Defendant Susan Cline directed students, including Juliet Shipley, to dress and act as spa technicians, offering patrons pedicures and other services using Mary Kay products, all for gain and/or profit of Susan Cline and/or Defendants.

76.    Students such as Juliet Shipley were not given a choice, but such work was mandatory.

77.    Defendant Susan Cline transported Juliet and other students to and from the School in Ohio to her home in West Virginia to work at her Mary Kay parties.

78.    On one occasion, after transporting them from School to labor at a Mary Kay event in this fashion at Susan Cline's home, Susan Cline told Juliet and other female children that their "reward" for working that day was a full-body spray tan.

79.    Susan Cline sexually groomed and urged these minor female students to fully disrobe in the presence of Susan Cline and two other adult women so they could be fully spray-tanned without tan lines.

80.    Juliet was uncomfortable with this but partially complied by disrobing only to her undergarments in front of Susan Cline, these adults, and other students.

81.    The two adult women fully undressed in the presence of these minor students.

82.    Juliet was embarrassed, emotionally distressed and disgusted by this invasion of her privacy and at being a child among naked adult women and her disrobed peers.

83.    Defendants Susan Cline and Barry Cline would frequently transport children, including Juliet, to and from the School in Ohio across state lines to/from their residence in West Virginia,

as well as the Church in Ohio, all while under the guise of other activities related to the School and/or the Church, including those referenced herein.

84.     Children from the School in Ohio were often invited to attend "sleepovers" across state lines at the West Virginia home of Defendants Susan and Barry Cline. Defendant Susan Cline then further groomed female children by bringing them into her bedroom to sleep in the same bed with her, and to watch television "under the covers".

85.     Plaintiff and two other female children were made to lay in bed with Defendant Susan Cline. On one occasion, Defendant Susan Cline showed all three girls an electric vibration function on the bed and described the sexual gratification she and Defendant Barry Cline derived from it.

86.     This was but one occasion on which Defendant Susan Cline described details of her and Defendant Barry Cline's sex life. Defendant Susan Cline gave such descriptions and made such remarks routinely at the School, at the Church, at School- and Church-related events, and at her home.

87.     Defendant Susan Cline also forced female children, including Juliet, to sleep in bed with her on overnight trips sponsored by the School and/or the Church. This was emotionally distressing to Juliet, who often could not sleep due to these unnatural arrangements with her teacher/pastor, but Juliet feared Defendant Susan Cline would be angered at any resistance. In any event, Juliet had no way to leave.

88.     On one occasion when Defendant Susan Cline was sleeping in bed with Juliet and another female child, she explicitly told them that she (Cline) "wasn't wearing any underwear." Juliet was embarrassed, emotionally distressed and disgusted at this, but again, had no way to leave.

16

89.    In and around 2019, Defendant Susan Cline engaged Juliet and two other female students in a sexually explicit game of "Kahoot", which took place at the Clines' West Virginia residence under the guise of another School-related and/or Church-related "sleepover".

90.    Sitting at the dinner table, Defendant Susan Cline asked if the girls "wanted to do something fun." Defendant Susan Cline then pulled up the game about sex facts and engaged the girls in it. One of the exemplary questions was "how many grams of protein is in [a certain amount] of ejaculate." Plaintiff was embarrassed, emotionally distressed and disgusted by this, but had no way to leave.

91.    On other occasions at the Church, Defendant Barry Cline engaged in sexual grooming activities toward female students, including Juliet. For example, he remarked suggestively to female students that if they were older, "we would have some fun." This caused fear and emotional distress among female students, including Juliet.

92.    While Defendant Barry Cline did not make this comment directly to Juliet, he would often tell her at Church she was pretty and that "the boys are going to come after [her] when [she] was older".

93.    At the School and at the Clines' home, Defendant Barry Cline would touch Juliet's buttocks either in the form of a spank or an inappropriate hug, and he would also have her sit on his lap.

94.    The Clines, and in particular Susan Cline, imposed hard discipline on students and engaged in frequent acts of retaliation against them for resisting or refusing to cooperate with any demands.

95.    For example, students were spanked by Susan Cline and/or others with paddles or by hand.

96.    On other occasions at School, students were disciplined by placement in an isolated classroom all day.

97.     On other occasions at School, Susan Cline convened a "roundtable" method of discipline wherein she manipulated students to confess and reform from behavior that displeased her. The "roundtable" was a form of public humiliation that occurred in front of the student body. Juliet was subjected to "roundtable" on at least one occasion, and from that experience and observation of other "roundtables", feared them.

98.     This Complaint is not an exhaustive list; there were other forms of sexual advances, grooming, retaliation and discipline carried out at School, at the Church, at the Clines' home, and on School- and Church-related trips.

99.     Defendant(s) engaged in other sexual conduct, as against Plaintiff directly and indirectly, which was damaging to Plaintiff.

### Emotional Abuse

100.    In addition to the above actions, Defendants took many actions which created and maintained an intentional and severely emotionally distressing environment which was harmful to students, including Juliet. For example:

    a.  During Juliet's sixth grade year at the School, Defendants made her and other students watch a video called "The Silent Scream,", which depicted an ultrasound abortion of a 12-week-old fetus. The movie showed an abortion in graphic and disturbing detail. It terrified Juliet and her young peers, and caused Juliet to suffer lasting severe emotional distress.

    b.  On one occasion at the School during Juliet's 7th or 8th grade year, she and other students were forced to watch a pornographic video depicting sexual intercourse that Defendants, and in particular Susan Cline, claimed was for "sexual education"

purposes. The video had no educational value and was totally inappropriate for children of Juliet's age.

101.    Defendants routinely attempted to normalize traumatizing and sexually explicit behavior and integrated it into the educational setting and related activities in which they involved students.

102.    For example, Defendants Susan Cline and Barry Cline would frequently brag suggestively to students about the details of their sex life at the School and at their home, deliberately taunting and embarrassing students.

103.    At the School, Defendant Susan Cline asked students to diagram a sentence that she and Barry Cline "gyrated all over the bedroom", as well as other suggestive, inappropriate sentences that evoked embarrassment and emotional distress in their young students.

104.    Defendants would instruct middle school students to complete "coloring pages" at the School which consisted solely of images of penises and vaginas, to the great embarrassment and humiliation of all.

105.    Defendants Susan Cline and Barry Cline also controlled dating relationships within the School, which they called "courtships". They dictated which students could date one another, and directed which students were to marry.

106.    Defendants Susan Cline and Barry Cline designated a "courtship" for Juliet with a male student many years older than she. Thankfully, that did not materialize, but the prospect of forced dating and marriage to an older male was still intimidating and emotionally distressing to Juliet.

107.    In 2020, Defendants transported students to Walt Disney Theme Park in Orlando, Florida for purposes of another School- and Church-related theatrical performance. Defendant Susan Cline had some children perform in Jewish concentration camp uniforms. Other performing children

wearing Nazi patches then pretended to shoot them, causing them to fall down into the shape of a swastika. Defendant Susan Cline's daughter was dressed as Adolf Hitler.

108.    All this was done despite full knowledge that members of Juliet's family had been persecuted by the Nazis. In fact, the backdrop Defendant Susan Cline incorporated into the performance depicted photos of Juliet's great-grandparents who had suffered in a Nazi camp in occupied Poland.

109.    The pattern of abuse described above and other events like them perpetrated by Defendants resulted in Plaintiff requiring emergency medical care and treatment for suicidal ideation, self-harm and attempts to complete suicide off-premises of the School and Church.

110.    When Plaintiff told Defendant Susan Cline about the suicide attempt, Susan Cline coldly inquired, "Why didn't it work?"   She offered no referrals to Juliet and did not make any report to Juliet's parents, to authorities or state agencies.

**Physical Abuse**

111.    In 2016, Juliet suffered from significant stress and anxiety-related stomach issues which sometimes required her to frequent the bathroom.

112.    Defendants' staff (a teacher) forced Juliet to take adult doses of medication (Immodium) at the School to stop her from using the bathroom, which then rendered her unable to use the bathroom for days or weeks at a time.

113.    Rather than referring her for medical attention or psychological treatment for any medical or emotional issue, Defendants by and through Susan and Barry Cline would perform "exorcisms" on Juliet at the School and the Church.

114.    "Exorcisms" were common at the School and the Church.

115.    To perform an "exorcism", Defendants Susan Cline and Barry Cline would either position a child on the floor or standing up.  They would place anointing oil on the child's forehead, squeeze the child's head with their hands, and also forcefully jerk the child's head.

116.    Defendants Susan Cline and Barry Cline performed such an "exorcism" on Juliet two or three times at the Church, telling her that demons were the cause of her stomach issues, and they needed to "pray it out of [her]".

117.    Defendants Susan and Barry Cline guilted plaintiff for taking prescribed medication and told her that antidepressants were "ungodly' and a "government plot" to "make everyone act the same."

118.    During her time at the School/the Church, Juliet began experiencing frequent and full-blown panic attacks. She suffered these panic attacks in the presence of Defendants Susan Cline, Barry Cline, staff at the School, and the Church, and in front of staff. No one rendered aid.

119.    Instead, Susan Cline and Barry Cline and staff told Juliet she was possessed by demons, forcibly held down and prayed over her, contributing further to her emotional distress.

120.    Defendants also "re-baptized" Juliet on three occasions, twice at the Church and once in the pool at the Clines' home, suggesting Juliet needed this for healing.

**Exploitation and Forced Labor**

121.    In addition to the specific Mary Kay event described above, Defendant Susan Cline made older students, including Juliet, serve as Mary Kay representatives and work under her on other occasions to improve her sales numbers and or gain/profit for herself or other Defendants.

122.    Juliet and other children were also required to do physical labor and cleaning at the Church a few times each month. Defendants thereby received the value of services performed.

21

123. On other occasions, Defendants had Juliet and other children perform cleaning, yard work, and washing cars for other Church members or for the Clines at their West Virginia home. Defendants thereby received the value of services performed.

124. Except for the Mary Kay events, each of the remaining forms of forced labor were mandated as part of the School's 180 hours of required community service. Students could not graduate without completing these.

125. These labors were completed during the hours of the school day for which Defendants were charging tuition and were being paid to educate students.

126. Defendants may have received payment or other things of value from this labor, presently unascertainable to Plaintiff.

127. Defendant Susan Cline transported children, including Juliet, to the worksites on these occasions using the School/Church van. Such transports frequently crossed state lines between Ohio and West Virginia.

## Educational Neglect

128. Despite promoting their School as one of academic excellence, Defendants did not retain qualified teachers. For example, few, if any of the teachers were accredited or even trained in education. Some were simply parents of the students, many of whom enjoyed reduced tuition in exchange for teaching. The history teacher was a plumber by trade who did not appear to have any specialized history training.

129. The "education" Defendants imparted to students, including Juliet, was abysmal. Their courses rendered little to no educational value, and little time was dedicated to instruction.

130. When Juliet was able to extricate herself from the School in and around 2020, she was far behind students her age and in need of significant remedial education.

131.    Later, in or around fall of 2024, when transferring schools again, Juliet discovered that Defendants had falsified her educational transcript to cover their misdeeds.

132.    Specifically, Defendants indicated that Juliet had taken Latin 1, Latin 2, Civics, Mythology, STEM, and Korean. Plaintiff took none of those, and Latin 2 was not even offered at the School. Before she could pursue further study beyond high school, Juliet was forced to secure and pay for remedial tutoring. Her math skills were at a 5th grade level when she "graduated" the School.

**Failures to Monitor, Protect, and Otherwise Prevent Foreseeable Harm**

133.    All of the abuse, acts, omissions, and harm alleged in this Complaint occurred as a result of Defendants' negligent operation of the School, the Church, and other extended premises on which Defendants were *in loco parentis* to Plaintiff as she was in their care, custody, or control.

134.    Such negligence included but was not limited to Defendants' negligent hiring, retention, and supervision of staff and administrators such as Susan and Barry Cline, as well as Defendants' failure to monitor their premises as needed to ensure child protection.

135.    The aforesaid abuse, acts, omissions, and harm further resulted from Defendants' failure to establish policies, procedures and safeguards to prevent and eradicate abuses such as those alleged herein, and/or failure to monitor and evaluate settings and scenarios which may give rise to such abuse, acts, omissions or harm (i.e., the School, the Church, the Cline home, and extended sites such as travel sites for dance performances).

136.    If other events like those alleged herein occurred prior to or during Juliet's enrollment, Defendants were negligent in failing to investigate and respond to those allegations, which predicated and contributed to the harm inflicted upon Juliet.

137.    The abuse, acts, omissions and harm complained of herein were foreseeable and Defendants knew or should have known of the potential for each of them.

23

138.    Alternatively, Defendants acted with a willful and malicious intent to cause injury, in conscious disregard of their duties or without just cause or excuse, or knew that the harm complained of herein was a substantially certain consequence of their behavior.

139.    As a direct and proximate result of the Defendants' acts and omissions, or that of any one or more of them, Plaintiff was physically injured and has suffered severe emotional distress, anguish, and humiliation, all of which have necessitated medical treatment and expenditures. Plaintiff has also suffered the lost value of education and has sustained economic damages in remediation of her lost education, together with other economic losses yet to be determined. Each of these damages are ongoing and expected to continue into the future.

## COUNT I: COERCION AND ENTICEMENT TO ABUSIVE SEXUAL CONTACT IN VIOLATION OF 18 U.S.C. §§ 2422, 2244, 2242, 2243, AND 2255

140.    The preceding paragraphs are incorporated by reference as if set forth in their entirety herein.

141.    Defendants violated 18 U.S.C. § 2422(a) by knowingly persuading, inducing, enticing, or coercing Juliet to travel in interstate commerce to engage in sexual activity for which one can be charged with a criminal offense, or attempting to do so.

142.    As outlined in this section, "sexual activity for which any person can be charged with a criminal offense" does not require interpersonal physical contact, but does include the full array of criminalized sexual offenses.

143.    Here, Defendants engaged in sexual activity criminalized by 18 U.S.C. § 2244(a)(2), Abusive Sexual Contact, because they knowingly caused Juliet to engage in sexual contact, which is punishable by imprisonment and/or fines.

144.    This sexual contact, as defined by 18 U.S.C. § 2246(3), included but was not limited to Susan and Barry Cline's intentional touching of Juliet's breast and buttocks and by forcing Juliet

to touch and otherwise make contact with Susan Cline's breasts with intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any of them. As set forth above, such abuse and other abuse like it occurred on multiple occasions.

145. Defendants further violated 18 U.S.C. §§ 2422 and 2244 when they, by and through Susan and Barry Cline, knowingly caused Juliet to engage in the above sexual contact by placing her in fear of retaliation, and also knowingly engaged her in the above sexual contact when she, a minor, was incapable of apprising the nature of the conduct on account of her age, both of which are independently criminally punishable by 18 U.S.C. § 2242(1) and (2).

146. Defendants further violated 18 U.S.C. §§ 2422 and 2244(a)(3) by and through Susan and Barry Cline when they knowingly engaged in sexual contact with Juliet when she was between 12 and 16 years of age, and while Susan and Barry Cline were at least four years older than she, which is criminally punishable by 18 U.S.C. § 2243(a).

147. Defendants are liable to Juliet for damages as allowed by 18 U.S.C. §§ 2255 and 2422, which incorporate the above provisions.

148. As a direct and proximate result of the Defendants' acts and omissions, or that of any one or more of them, Plaintiff was physically injured and has suffered severe emotional distress, anguish, and humiliation, all of which have necessitated medical treatment and expenditures. Plaintiff has also suffered the lost value of education and has sustained economic damages in remediation of her lost education, together with other economic losses yet to be determined. Each of these damages are ongoing and expected to continue into the future.

## COUNT II: FORCED LABOR IN VIOLATION OF 18 U.S.C. §§ 1589, 2255

149. The preceding paragraphs are incorporated by reference as if set forth in their entirety herein.

150. Defendants violated 18 U.S.C. § 1589 because they provided or obtained the labor or services of Plaintiff by means of (or by means of a combination of ) force, threats of force, physical restraint, or threats of physical restraint upon her; by means of serious harm or threats of serious harm to her; and by means of any scheme, plan, or pattern intended to cause her to believe that if she did not perform such labor or services, she would suffer serious harm or physical restraint.

151. Plaintiff was in fear of serious harm by virtue of Defendants' retaliation upon herself and other students described above (including but not limited to isolation, paddling, spanking, "roundtables", exorcisms, sexually-charged and manipulative behaviors, as well grooming behaviors by Barry and Susan Cline), as well as other psychological harm by way of intimidation, humiliation, and reputational harm to herself as a child of ages 12-18.

152. These violations include, but are not limited to, the allegations described in the Factual Allegations above: forced labor at Mary Kay events; forced labor at the Cline home; forced labor at the Church; and forced labor at the homes of Church members, all of which resulted in value flowing back to Defendants through their venture.

153. As a direct and proximate result of the Defendants' acts and omissions, or that of any one or more of them, Plaintiff was physically injured and has suffered severe emotional distress, anguish, and humiliation, all of which have necessitated medical treatment and expenditures. Plaintiff has also suffered the lost value of education and has sustained economic damages in remediation of her lost education, together with other economic losses yet to be determined. Each of these damages are ongoing and expected to continue into the future.

154. Defendants are liable to Plaintiff for these injuries pursuant to 18 U.S.C. § 1589 and § 2255.

## COUNT III: BENEFITING FROM TRAFFICKING OF CHILDREN IN VIOLATION OF 18 U.S.C. §§ 1589(b), 1591, 1595(a) & 2255

155. The preceding paragraphs are incorporated by reference as if set forth in their entirety herein.

156. Defendants, separately or by and through their enterprise(s), participated in a venture which they knew or should have known recruited, enticed, harbored, transported, provided, maintained or patronized, or benefited, financially or by receiving anything of value, from violations of 18 U.S.C. § 1589 above, as well as sex trafficking of children in violation of 18 U.S.C. §§1591 (the Trafficking Victims Protection Reauthorization Act or "TVPA"). Defendants are answerable under beneficiary liability theories set forth in 18 U.S.C. § 1595(a).

157. More specifically, Defendants (1) knowingly benefited financially or by receiving anything of value (2) from taking part in a common undertaking or enterprise involving risk and potential profit; (3) the undertaking/enterprise violated the TVPRA as to Plaintiff; and (4) Defendant(s) had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to Plaintiff.

158. The acts described in the Factual Allegations above (and similar events throughout Plaintiff's enrollment) constitute "forced labor" and "commercial sex acts" within the TVPRA.

159. Defendants knowingly and continuously reaped benefit from the tuition they accepted for Plaintiff's enrollment and participation in each of these events, as well the value of Plaintiff's service at Susan Cline's Mary Kay event incorporating nude spray tanning among adults and children.

160. Defendants also knowingly gained value from Plaintiff's participation in dance performances which promoted and elevated the standing or profile of the School and/or the

27

Church, and which contributed to recruiting and enrollment as the success of those performances were displayed and touted by the School and/or the Church. To the extent any prize money was won for dance performances, that too was value Defendants knowingly derived from Plaintiff's involvement, even as Defendants sexually exploited Plaintiff as described above at or during those events.

161. Defendants had actual or constructive knowledge of each violation of the TVPRA because they were direct perpetrators and/or alter egos, joint venturers, and common enterprisers with one another and all shared profit and gain from such events.

162. As a direct and proximate result of the Defendants' acts or omissions, or that of any one or more of them, Plaintiff was physically injured and has suffered severe emotional distress, anguish, and humiliation, all of which have necessitated medical treatment and expenditures. Plaintiff has also suffered the lost value of education and has sustained economic damages in remediation of her lost education, together with other economic losses yet to be determined. Each of these damages are ongoing and expected to continue into the future.

163. Defendant(s) are liable to Plaintiff for these injuries pursuant to 18 U.S.C. § 1595 and § 2255.

### COUNT III: ASSAULT AND BATTERY BASED ON OR RESULTING FROM CHILDHOOD SEXUAL ABUSE PURSUANT TO OHIO REVISED CODE § 2305.111

164. The preceding paragraphs are incorporated by reference as if set forth in their entirety herein.

165. Defendants, by and through Susan Cline and Barry Cline, committed repeated assaults and batteries against Juliet Shipley, including but not limited to childhood sexual abuse as defined by Ohio Revised Code § 2305.111 while Juliet was a minor, at the School, at the Church, at the Cline's residence, and elsewhere on School- and Church-sponsored events such as those described above.

166. These assaults and batteries occurred while Defendants were *in loco parentis* to Juliet within the meaning of Ohio Revised Code § 2305.111(A)(1)(b)(i) above, and while Defendants were teachers, administrators, other persons in authority or instructors as more fully defined in (b)(ii) or (b)(v) above.

167. These acts of unwelcome touching and imposed fear of unwelcome touching include, but are not limited to:

    a. The "tampon incident";
    b. Susan Cline grabbing Juliet's breast;
    c. Susan Cline slapping Juliet's backside;
    d. Susan Cline forcing Juliet to sleep in bed with heron multiple occasions; one of which involved Susan Cline sleeping without underwear and announcing same;
    e. Susan Cline holding Juliet's head against her breasts and spanking her rear;
    f. Susan Cline forcing Juliet to touch Susan Cline's breasts with her hands;
    g. Barry Cline forcing Juliet to sit on his lap;
    h. Barry Cline spanking Juliet on her bottom;
    i. The spray tan incident;
    j. Forced participation in sexualized games, including a Kahoot game about sex facts;
    k. Forced "exorcisms" and "re-baptisms".

168. The acts above occurring prior to Juliet's attaining the age of 13 constitute "Gross Sexual Imposition" as defined by Ohio Revised Code § 2907.05(A)(4) above.

169. The acts above occurring while Juliet was between the ages of 13 and 16 constitute "Sexual Imposition" as defined by Ohio Revised Code § 2907.06(A) above.

170. These acts above constitute "sexual contact" as defined by Ohio Revised Code § 2907.01(B) and were perpetrated upon Juliet for the purpose of sexually arousing or gratifying Susan Cline and/or Barry Cline.

171. These acts were committed willfully, wantonly, and intentionally while Plaintiff was in Defendants' care.

172.    Defendants were negligent in that they either knew or should have known of the potential for the aforesaid assaults and batteries to occur, and failed to take reasonable and prudent steps to prevent them, as designated throughout this Complaint.

173.    As a direct and proximate result of the Defendants' acts or omissions, or that of any one or more of them, Plaintiff was physically injured and has suffered severe emotional distress, anguish, and humiliation, all of which have necessitated medical treatment and expenditures. Plaintiff has also suffered the lost value of education and has sustained economic damages in remediation of her lost education, together with other economic losses yet to be determined. Each of these damages are ongoing and expected to continue into the future.

### COUNT V: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

174.    The preceding paragraphs are incorporated by reference as if set forth in their entirety herein.

175.    Defendants' conduct was extreme and outrageous.

176.    Defendants acted intentionally and recklessly in their conduct described in the Factual Allegations above, including but not limited to all of the aforesaid sexual abuse, physical abuse, emotional abuse and forced labor allegations.

177.    This conduct caused serious, severe and debilitating emotional distress to Plaintiff, as demonstrated by her panic attacks, physical manifestations and ailments, and suicide attempt, among other symptomologies.

178.    Plaintiff's claim for intentional infliction of emotional distress is predicated on the same facts as her child sexual abuse claim for sexual abuse, assault and battery, and is therefore controlled by the extended statutes of limitation applicable to such actions.

179.     As a direct and proximate result of the Defendants' acts or omissions, or that of any one or more of them, Plaintiff was physically injured and has suffered severe and debilitating emotional distress, anguish, and humiliation, all of which have necessitated medical treatment and expenditures. Plaintiff has also suffered the lost value of education and has sustained economic damages in remediation of her lost education, together with other economic losses yet to be determined. Each of these damages are ongoing and expected to continue into the future.

### COUNT VI: NEGLIGENCE

180.     The preceding paragraphs are incorporated by reference as if set forth in their entirety herein.

181.     Defendants were in a special relationship *in loco parentis* to Juliet, a minor, while she was at their School, their Church, at their home, and on all related activities in which they were her custodian(s).

182.     First, Defendants specifically owed a duty to Plaintiff to maintain an environment at the School, the Church, their home, and on all School- and Church-related extensions that was free from sexual abuse, sexual exploitation, physical abuse, forced labor, assault and battery, intentional infliction of emotional distress, and other harmful conduct.

183.     Defendants failed to take reasonable and prudent measures for the protection of Plaintiff and other students, including but not limited to (a) failing to monitor or inspect their premises to ensure child protection; (b) failing to establish policies, procedures and other safeguards to prevent or eradicate abuses such as those alleged herein; (c) failing to evaluate settings and scenarios which may give rise to such abuse, acts, omissions or harm (i.e., the School, the Church, the Cline home, and extended sites such as travel sites for dance performances).

184.    If other events like those alleged herein occurred prior to or during Juliet's enrollment, Defendants were negligent in failing to investigate and respond to those allegations, which predicated and contributed to the harm inflicted upon Juliet.

185.    The abuse, acts, omissions and harm complained of herein were foreseeable and Defendants knew or should have known of the potential for each of them.

186.    Defendants also owed a duty to Plaintiff to provide proper education and nurture while she was their student as required by state law and applicable standards of care.

187.    Defendants knew, or should have known, that Susan Cline and Barry Cline and the staff they retained at the School were not properly trained, accredited, or certified to teach and/or administer the School so that proper education would be given.

188.    Defendants knew, or should have known, that Susan Cline and Barry Cline and staff at the School were not performing their duties of providing a proper education to Plaintiff and others, but failed to evaluate or review performances.

189.    Defendants breached each of the aforesaid duties and were negligent in such other ways as may become apparent through further investigation and discovery.

190.    As a direct and proximate result of the Defendants' acts or omissions, or that of any one or more of them, Plaintiff was physically injured and has suffered severe emotional distress, anguish, and humiliation, all of which have necessitated medical treatment and expenditures. Plaintiff has also suffered the lost value of education and has sustained economic damages in remediation of her lost education, together with other economic losses yet to be determined. Each of these damages are ongoing and expected to continue into the future.

## COUNT VII: NEGLIGENT HIRING, TRAINING, SUPERVISION AND RETENTION OF STAFF

191.    The preceding paragraphs are incorporated by reference as if set forth in their entirety herein.

192.    Defendants owed a duty to Plaintiff to exercise reasonable care in the hiring, training, supervision, and retention of its staff, including but not limited to Susan Cline and Barry Cline.

193.    Upon information and belief, Defendants failed to properly vet Susan Cline and Barry Cline, as well as other staff they hired, to ensure that they were safe to work with children, and that they were otherwise qualified to teach.

194.    Defendants knew, or should have known, of the propensity of Susan Cline and Barry Cline to engage in abusive and harmful conduct toward students.

195.    Defendants failed to properly train Susan and Barry Cline and staff who worked with children in the definitions of, recognition of, and prevention of child sexual abuse, assault and battery, recognition and prevention of grooming, as well as of other harms alleged herein.

196.    Defendants failed to supervise Susan and Barry Cline in the various capacities in which they interacted with children, and failed to set boundary expectations on staff-student interactions.

197.    Defendants failed to establish a procedure whereby students or parents could register complaints against Susan or Barry Cline or staff, and failed to keep record of any such complaints or allegations against them, both of which further contributed to the occurrences described herein.

198.    Defendants failed to conduct proper performance reviews or evaluations of Susan or Barry Cline or staff, and/or failed to discipline or correct any deficiencies which would have prevented the harm to Juliet.

199.    Instead, Defendants negligently allowed Susan and Barry Cline unfettered access to Plaintiff and other students with virtually no supervision or accountability, when it was foreseeable

that harm such as that alleged herein could occur as a direct and proximate result of that arrangement.

200.    Defendants were otherwise negligent in failing to prevent abuse upon Plaintiff like that described herein.

201.    As a direct and proximate result of the Defendants' acts or omissions, or that of any one or more of them, Plaintiff was physically injured and has suffered severe emotional distress, anguish, and humiliation, all of which have necessitated medical treatment and expenditures. Plaintiff has also suffered the lost value of education and has sustained economic damages in remediation of her lost education, together with other economic losses yet to be determined. Each of these damages are ongoing and expected to continue into the future.

## COUNT VIII: BREACH OF CONTRACT

202.    The preceding paragraphs are incorporated by reference as if set forth in their entirety herein.

203.    Plaintiff's parent or guardian entered into a contract with Defendants whereby Defendants promised to provide Plaintiff high quality education and activities in exchange for tuition payments and/or other consideration.

204.    Defendants breached this contract by failing to provide those services as promised to Plaintiff, first by hiring unqualified staff, then by failing to supervise those staff, then by providing little to no education in the classes offered, then by graduating Plaintiff when she had not received proper education, and ultimately by forging Plaintiff's transcripts to falsely represent that she had taken courses listed above.

205.    Defendants breached this contract in other ways by failing to perform their agreed obligations.

206. Plaintiff was the intended beneficiary of this contract and suffered damages as a direct and proximate result of Defendants' breach.

207. As a direct and proximate result of the Defendants' acts or omissions, or that of any one or more of them, Plaintiff has suffered the lost value of education and has sustained economic damages in remediation of her lost education, together with other economic losses yet to be determined. Plaintiff has also been set back in her pursuit of education and career. Each of these damages are ongoing and expected to continue into the future.

## COUNT IX: DECEPTIVE TRADE PRACTICES

208. The preceding paragraphs are incorporated by reference as if set forth in their entirety herein.

209. The Defendants' conduct, as described above, constitutes unfair and deceptive acts or practices in the conduct of trade or commerce in violation of Ohio Revised Code § 4165.02, Deceptive Trade Practice Actions.

210. Defendants violated the specific provisions of the Code in each of the following ways:

   a. Representing that services of the School and its educational programming had characteristics or benefits that they do not have, in violation of § (A)(7), in that they did not staff the School with qualified teachers, nor did they provide quality instruction as represented, and with respect to Juliet Shipley, represented that she had completed courses she had not taken in order for her to graduate.

   b. Representing that goods or services are of a particular standard, quality or grade in violation of § (A)(9); in that they did not staff the School with qualified teachers, nor did they provide quality instruction as represented, and with respect to Juliet

Shipley, represented that she had completed courses she had not taken in order for her to graduate.

211. As a direct and proximate result of the Defendants' acts or omissions, or that of any one or more of them, Plaintiff has suffered the lost value of education and has sustained economic damages in remediation of her lost education, together with other economic losses yet to be determined. Plaintiff has also suffered emotional distress and has been set behind in her pursuit of education and career. Each of these damages are ongoing and expected to continue into the future.

## COUNT X: CIVIL CONSPIRACY

212. The preceding paragraphs are incorporated by reference as if set forth in their entirety herein.

213. Defendants entered into a conspiracy to defraud Plaintiff and her parent or guardian, to cover up their abusive conduct, and to otherwise violate the laws of Ohio and those of the United States, including but not limited to 42 U.S.C. § 1985(3), depriving persons of rights or privileges of law.

214. This conspiracy involved a common plan or scheme to misrepresent the quality of education provided; to exploit and abuse children sexually and through forced labor; and to conceal these activities from parents, law enforcement, and other authorities.

215. As a direct and proximate result of the Defendants' acts or omissions, or that of any one or more of them, Plaintiff was physically injured and has suffered severe emotional distress, anguish, and humiliation, all of which have necessitated medical treatment and expenditures. Plaintiff has also suffered the lost value of education and has sustained economic damages in remediation of her lost education, together with other economic losses yet to be determined. Each of these damages are ongoing and expected to continue into the future.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Juliet Shipley prays for judgment against the Defendants, jointly and

severally, as follows:

      a. For compensatory damages (economic and non-economic) in amounts to be proven
         at trial;
      b. For punitive damages;
      c. For attorney's fees and costs;
      d. For pre-judgment and post-judgment interest; and
      e. For such other and further relief as the Court may deem just and equitable.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS.**

                **PLAINTIFF JULIET SHIPLEY,**
                **By counsel.**

                */s/ konrad kircher*

                Konrad Kircher (OH State Bar No.)
                Kircher Law, LLC
                312 Walnut St., Ste. 1600
                Cincinnati, OH 45202
                P: (513) 218-1252
                F: (513) 586-0480
                konrad@kircher.law

                Sharon F. Iskra (*Pro Hac Vice
                Application Pending*)
                **BAILEY & GLASSER, LLP**
                209 Capitol Street
                Charleston, WV 25301
                P: (304) 345-6555
                F: (304) 342-1110
                siskra@baileyglasser.com

                George Sidiropolis (*Pro Hac Vice
                Application Forthcoming*)
                **FLANIGAN LEGAL, PLLC**
                1140 Main Street, 4th Floor
                Wheeling, WV 26003
                P: (304) 281-4070
                F: (304) 233-7766
                George@flaniganlegal.com